FILED
2014 Dec-11  PM 05:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **TRACY O. CRANE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 2:11-CV-3568-VEH** |
| | ) |
| **ERIC H. HOLDER, JR.,** | ) |
| | ) |
| **Defendant.** | ) |

---

## MEMORANDUM OPINION AND ORDER

This is a civil action filed by the plaintiff, Tracy O. Crane, against the defendant, Eric H. Holder, Jr., in his official capacity as the Attorney General of the United States, and head of the United States Department of Justice. (Doc. 16). The Amended Complaint alleges that Federal Bureau of Investigation, a division of the Department of Justice, recruited the plaintiff for a so called "direct hire" position as a "Paralegal Specialist/Asset Forfeiture Investigator," but then "denied [the] [p]laintiff employment even though he was the most qualified applicant." (Doc. 16 at 1). The plaintiff alleges the department's actions violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Specifically, the Amended Complaint sets out the following violations of Title VII: "National Origin Discrimination" (Count One); "Racially Disparate Impact

[Discrimination]" (Count Two); and various acts of retaliation (Counts Three, Four, Five, Six, and Seven).  The Amended Complaint also alleges that the defendant discriminated against the plaintiff on account of his age in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* ("ADEA") (Count Eight).

The case comes before the court on the cross motions for summary judgment by the parties.  (Docs. 68, 70).  For the reasons stated herein the plaintiff's motion (doc. 68) will be **DENIED**, and the defendant's motion (doc. 70) will be **GRANTED in part** and **DENIED in part.**

## I.   STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted).  The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and

2

identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden

3

of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial.

4

*Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." *S. Pilot Ins. Co. v. CECS, Inc.*, No. 1:11 CV 3863 AT, 2014 WL 4977805, at *2 (N.D. Ga. Sept. 12, 2014) (citing *Am. Bankers Ins. Group v. United States,* 408 F.3d 1328, 1331 (11th Cir.2005)). "The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *Id.* "The Eleventh Circuit has explained that '[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed.'" *Id. (quoting United States v. Oakley,* 744 F.2d 1553, 1555 (11th Cir.1984)). "Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id.* (quoting *Oakley*, 744 F2d at 1555–56).

## II.    FACTS

### A.    <u>The FBI's Diversity Program</u>

The FBI has a "diversity program" concerning Native Americans (doc. 69-1 at

17), which the plaintiff references in some of his claims.  According to its website

> [t]he Program is directed at ensuring that all American Indians/Alaskan Natives have the full measure of employment in the federal work force. These rights are protected through Government Treaties.
>
> The goals and objectives of the American Indian/Alaskan Native Program are to:
>
>> – Eliminate discriminatory practices
>> – Assure that American Indians/Alaskan Natives are appropriately represented throughout the work force
>> – Increase the representation of American Indians/Alaskan Natives in key occupational categories throughout the grade levels (SES, GS, and WGB), and in policy-making positions (particular attention will be focused on increasing representation in the Senior Executive Service)
>> – Modify and/or change policy to increase opportunities for all employees to advance to their highest potential[, and]
>> – Provide advisory services including: informational programs, training sessions, and counseling

(Doc. 69-1 at 18).[1]  Native Americans account for 0.40% of Special Agents (i.e., 55

Special Agents out of 13,766 total agents) and 0.51% of the Professional Staff

---

[1]  The plaintiff asserts in his facts that this is "a policy of affirmative action."  (Doc. 69 at 4 (proffered fact 4)).  In support of this assertion he cites generally to "Exhibit 'C'" to his motion for summary judgment.   (Doc. 69 at 4 (proffered fact 4)).  Nothing in Exhibit C supports this assertion.

Employees (i.e., 111 Professional Staff Employees out of 21,863 total employees).[2]

## B.    <u>The Plaintiff</u>

The plaintiff, Tracy O. Crane, is Native American.  He also is a former FBI employee, who was assigned to the Birmingham Division of the FBI.  Before he retired, the plaintiff was with the FBI for approximately seventeen (17) years, during which he served part of his time as a Supervisory Intelligence Analyst (SIA) for the FBI's Birmingham Division.   In 2008, he retired from the FBI with a pay classification of "GS-14."  At the time he retired, he commanded a Field Intelligence Group ("FIG").

Crane previously held the Paralegal Specialist/Asset Forfeiture Investigator position at issue in the instant case.  After he held the Paralegal Specialist/Asset Forfeiture Investigator, he was assigned to the Birmingham Office as a Supervisory Administrative Specialist at the GS-12 pay grade before becoming the commander of a FIG as a GS-14. The plaintiff states in his affidavit that "a few days prior to my retirement in 2008, the previous [SAC] stated that the Birmingham Office would

---

[2]  The fact which contains these figures is proffered by the plaintiff who cites, as evidentiary support, a printed copy of a web page.  (Doc. 69 at 5 (citing doc. 69-1 at 19-20)). The court notes that the referenced exhibit is unreadable and the fact which contains these percentages is  "disputed" by the defendant.  (Doc. 75-1 at 4).  However, the defendant does not dispute the percentages quoted, only the portion of the fact which stated that  "[t]he FBI is woefully deficient in the hiring of Native Americans."  (Doc. 69 at 5 (proffered fact 5)).  That conclusory and argumentative statement has been omitted.  The reminder of the fact is deemed admitted for the purpose of resolving the instant motions, and has been included.

'direct hire' me at the GS-12, Step 10, pay grade if I would consider staying on instead of retiring." (Doc. 69-1 at 25, ¶ 12). The plaintiff declined this offer.

Crane's last Performance Evaluation Report ("PAR") prior to his retirement gave him an "Excellent" performance rating, and contained comments by the rating official about Crane's skills and resourcefulness.[3] The comments were written by Acting Special Agent in Charge ("ASAC") Charles E. Regan. (Doc. 69-1 at 22, ¶5).[4] While the entire report is difficult to read, the following favorable comments are clear:

– "Crane demonstrated his ability to be flexible and adjust to an ever-changing program."

– "Crane is well respected within the Birmingham Field Office and with outside agencies."

---

[3] This fact, proffered by the plaintiff also included the conclusory statement that the comments were "glowing." (Doc. 69 at 5 (proffered fact 7)). The court has omitted that argumentative and conclusory statement.

[4] The defendant disputes that the comments were written by Regan, but states only that "[t]he PAR for FY 2007 does not specify the name of the person who drafted the comments . . .." (Doc. 75-1 at 5). That is so. Indeed, in the plaintiff's affidavit, wherein he states that Regan wrote the comments (doc. 69-1 at 22, ¶5), he also acknowledges that the "rating official's name and signature has been redacted for some reason. (doc. 69-1 at 22, ¶5)." The defendant's "dispute" cites no evidence which contradicts the plaintiff's statement, and there is no argument that the plaintiff's statement is not based on personal knowledge or otherwise should be disregarded. Interestingly, the defendant does not affirmatively state that Regan was not the person who wrote the comments. Regardless, consistent with the uncontroverted evidence, the court includes the fact as proffered by the plaintiff.

– "Crane has an excellent working relationship with the ATAC at the United States Attorney's Office."

– "Crane . . . has enhanced the prominence of the FIG [with] outside agencies."

– "Crane has performed in an exceptional manner . . ..  He has earned the trust and confidence of Birmingham . . . management."

(Doc. 69-1 at 41).  On his ratings of "Critical Elements," Crane received the highest marks of "Outstanding" for "Relating with Others and Providing Professional Service," "and "Maintaining High Professional Standards."  (Doc. 69-1 at 40).  On a scale of 1-5 (with 5 being the highest rating), out of eight critical elements his average rating was 4.13.  (Doc. 69-1 at 40).

### C.   Norman Odom's Claim of Discrimination

After January of 2009, Division Administrative Officer ("AO") Norman Odom filed an EEO complaint alleging mistreatment by his supervisors.  (Doc. 74 at 34, ¶5).  Crane and Odom were friends.  In late 2009 or early 2010, Crane provided an affidavit which supported Odom.  (Doc. 74 at 35, ¶6).

### D.   The Paralegal Specialist/Asset Forfeiture Investigator Position

The parties agree that, in 2010, the need for a Paralegal Specialist/Asset Forfeiture Investigator occurred.  It is also clear that the person holding the position would have been supervised by Raymond Zicarelli, the Chief Division Counsel

9

("CDC") at the FBI office in Birmingham, Alabama. (Doc. 69-1 at 50(13, 16)). However, there are varying accounts of how that position was filled.[5]

### 1.   *The Plaintiff's and Stacy Crane's Version*

The plaintiff states in his affidavit that, at some point (the affidavit does not say when), Zicarelli called him and "wanted to know if [Crane] was interested in a 'direct hire'" for the position.  (Doc. 69-1 at 24, ¶10).  The parties appear to agree that a "direct hire" occurs when a position is not posted, there is no  competition for it, and a candidate is "directly" contacted and hired by the FBI.[6]  In his affidavit, Crane states that Crane told Zicarelli that "[he] might be interested, but [Crane] needed to discuss it with [his] wife."  (Doc. 69-1 at 24, ¶10).  Crane also states that "Zicarelli then contacted my wife to see if I would be willing to accept the job as a 'direct hire.'" (Doc. 69-1 at 24, ¶11).

---

[5] Because there are cross motions for summary judgment on the exact same issues, it is impossible to merely cast the facts "in the light most favorable to the non-movant," as each side is both movant <u>and</u> non-movant.  Accordingly, the court sets out <u>all</u> versions of the facts which are supported by the record.

[6] No evidence has been presented on this issue.  The plaintiff proffers the following fact:

14.     A "direct hire" is done by hiring the job candidate directly and without any competition versus a traditional posting which requests applicants to apply. Deposition of Raymond Zicarelli (Exhibit "H") at 73.

(Doc. 69 at 6-7, ¶14).  The citation to Zicarelli's deposition does not support this fact.  Indeed, elsewhere in his deposition Zicarelli stated that he does not know the difference between a "direct hire or regular posting."  (Doc. 69-1 at 64(69)).  This "fact" will not be included.

The plaintiff states in his affidavit:

> Early in the week of June 27, 2010, Mr. Zicarelli called again.  He asked
> me again if I would accept a "direct hire" position as a GS-12 Paralegal
> Specialist/Asset Forfeiture Investigator in the FBI.  He also told me that
> he knew that I retired as a GS-14, but the . . . position would only go to
> the GS-12, Step 10, pay grade.

(Doc. 69-1 at 25, ¶13).  Crane also states that he "understood" that "direct hire" meant

that there would be no competition for the position and that the FBI would hire him

directly.  (Doc. 69-1 at 25, ¶14).  Crane states that he (Crane) "responded that he

would accept the position."  (Doc. 69-1 at 25, ¶15).  Crane states in his affidavit that

Zicarelli told Crane to come in to the FBI's Birmingham Office the following

Tuesday, July 6, 2010, and "fill out paperwork."  (Doc. 69-1 at 25, ¶16).

Crane states that on June 27, 2010, Zicarelli called Crane to tell him that

"funding problems" came up, and the hire would take place after the fiscal year,

"most likely in the Fall of 2010."  (Doc. 69-1 at 25, ¶17).  Crane states that Zicarelli

"stated that I should not report on Tuesday, July 6, 2010, due to this funding

problem."  (Doc. 69-1 at 26, ¶18).  Crane states that "[i]n reliance on . . . Zicarelli's

statements, I waited until the Fall of 2010 before I enquired again about the position."

(Doc. 69-1 at 26, ¶19).

Crane's wife, Stacy Crane, states in her affidavit that Zicarelli called her on

June 23, 2010, and left a message.  (Doc. 69-1 at 43, ¶3). She states that at some point

(which is unstated in the affidavit) she returned his call and "[h]e said that he wanted to talk to me about Tracy Crane coming back to work at the FBI in the Paralegal Specialist/Asset Forfeiture Investigator position," and "asked [her] for [her] thoughts about Tracy Crane going back to work at the FBI." (Doc. 69-1 at 43-44, ¶¶6-7).

Mrs. Crane stated in her affidavit that she told Zicarelli that she would support her husband if he was interested in the position. (Doc. 69-1 at 44, ¶8). It was clear to Mrs. Crane that Zicarelli was talking about hiring her husband through the "direct hire" process. (Doc. 69-1 at 44, ¶10).

### 2. *Odom's Version*

Odom states in his affidavit that "[i]n late June of 2010, . . . Zicarelli . . . approached [Odom] about the recruitment of Crane as a 'direct hire,'" for the position at issue in this case. (Doc. 74 at 35, ¶8). Odom states that when Special Agent in Charge ("SAC") Patrick Maley "discovered that Zicarelli was recruiting Crane as a 'direct hire' for the [position] . . . Maley called me to his office." (Doc. 74 at 35, ¶10). Maley asked Odom what he thought about Crane for the position and Odom responded that Crane "had performed the same job for 4 or 5 years . . . had a Master's Degree . . . had a history of good job performance, and . . . seemed well qualified for the job." (Doc. 74 at 35, ¶¶11-12). Odom stated that Maley then told him that they "'would be going in a different direction,'" and "that they would advertise the job

instead of making a 'direct hire' of Crane."  (Doc. 74 at 36, ¶13) (internal quotes in original).

### 3.    *Zicarelli's Version*

In his deposition, Zicarelli stated that "for a while," as part of his job as CDC, he was "the special agent recruiter." (Doc. 69-1 at 50(13)).[7] He stated that the special agent recruiter would "attend career fairs and discuss special agent opportunities with people at the career fair if they are interested in joining the FBI."   (Doc. 69-1 at 50(14-15)).  Zicarelli knew the plaintiff was Native American.

Zicarelli confirms in his deposition that, before the position was posted, he "discussed the opportunity with a number of individuals that a position was coming open, and if they were interested, they should apply." (Doc. 69-1 at 51(17), 65(74, 76)).  He also confirmed in his deposition that one of these people was Crane.  (Doc. 69-1 at 51(18)).[8]

Zicarelli stated that he initiated a phone call to Tracy Crane sometime in April, May, or June of 2010.  (Doc. 69-1 at 61(60), 61(81)).   He made the call "[t]o advise [Crane] of a position coming open.  And that if he were interested, he should apply."

---

[7]  The citation refers to page 50 of document 69-1, which is a page out of a deposition travel transcript.  The court indicates in parentheses that the material cited appears on <u>deposition</u> page 13, on page 50 of document 69-1.

[8]  It is unclear from the evidence whether Zicarelli made these calls as part of his job as special agent recruiter.

(Doc. 69-1 at 62(61); *see also*, doc. 69-1 at 63(68), 64(70), 68(88), 69(89)).   The position had not been posted at that time.   (Doc. 69-1 at 69(89)).   Zicarelli stated in his deposition that he "believes" this was the only conversation that he had with the plaintiff while they were trying to find a person to fill the position.   (Doc. 69-1 at 63(65)).

Zicarelli denied having a conversation with Stacey Crane "about whether or not her husband should go back to work for the FBI."   (Doc. 69-1 at 70(94-95)).   Zicarelli stated in his deposition that he did call Mrs. Crane and that he "told her that he was trying to – [he] needed to get Tracey's number to advise him of an upcoming position. If he were interested, he should apply."   (Doc. 69-1 at 70(95-96)).   Zicarelli could not recall saying anything else.   (Doc. 69-1 at 70(96)).

In his deposition, Zicarelli states that he was never "involved in any direct hire in the FBI," was not "involved in any direct hiring policy of procedures."   (Doc. 69-1 at 79(132)).   He states that he never spoke to Regan about a possible direct hire of the plaintiff for the instant position.   (Doc. 69-1 at 78(128)).   Zicarelli confirmed in his deposition that "as the former CDC . . . it was not [his] job to perform any of the HR duties."   (Doc. 69-1 at 79(131-132)).

As noted above, Zicarelli stated that, before the position was filled, he only spoke to the plaintiff the one time, in April, May, or June of 2010.   The position was

posted internally and externally on July 13, 2010.  (Doc. 69-1 at 74(109)).  Zicarelli

states that he never called Crane back to tell him that the position had been posted.

(Doc. 69-1 at 69(89)).  Zicarelli states that after the position was posted he did not

contact Crane about the position.   (Doc. 69-1 at 79(132)).  He states that he did not

call any of the individuals back (whom he had originally contacted) after the job was

posted.  (Doc. 69-1 at 80(133))

Zicarelli states that, at some point,  "I received a call from Tracey. [sic]  He did

the talking.  I did the listening."  (Doc. 69-1 at 71(97)).  Zicarelli could not remember

the exact date of the conversation because he was sure that it occurred after Zicarelli

had retired in September of 2010.  (Doc. 69-1 at 71(97)).  Zicarelli further confirmed

that Crane contacted him about the position, that Zicarelli "only listened to what

[Crane] said," and that Zicarelli "did not discuss the job."  (Doc. 69-1 at 79(132)-

80(133)).  Other than this conversation and the one in April, May, or June of 2010,

Zicarelli could recall no other conversations with Mr. Crane.  (Doc. 69-1 at 71(97)).

### 4.    *Maley's Version*

After Zicarelli's initial discussions with Crane[9], Zicarelli had a conversation

with Maley regarding whether he wanted the job to be a "direct hire or traditional"

position.  (Doc. 69-1 at 65(73-76).  Maley did not know Crane because Crane retired

---

[9]  The court here refers to the discussion that occurred in April, May, or June of 2010.

in 2008 prior to Maley's arrival in Birmingham in July of 2009. Maley also admitted that he was "unaware" of Crane's national origin. Zicarelli did not inform Maley that Crane was Native American.

In his sworn statement, Maley stated as follows:

> It came to my attention, but I don't recall specifically how, that AO Odom and Birmingham Division Chief Division Counsel (CDC) Raymond Zicarelli were attempting a direct hire for the Paralegal Specialist position. This occurred a short time before the Paralegal Specialist position was officially posted on July 13, 2010. At that time, Crane appeared to have been recruited by either Zicarelli or Odom and the direct hiring process was well underway prior to my knowledge of this situation. As soon as I became aware, I inquired into the situation because as stated above "direct hires" are completely inconsistent with my leadership philosophy of being transparent, my promises to the Birmingham Division as to how I would lead the office, and division policies set forth in "issue # 76"[10] set forth earlier in the sign [sic], sworn statement. I recall I met with Odom and Zicarelli, [sic] on or about the same day I became aware of the situation, in my office. I remember that at this meeting, Odom advised me that Crane had served as the Forfeiture Paralegal previously, for many years, and that he recommended Crane for the Paralegal Specialist position. CDC Zicarelli concurred with Odom's opinion. I was frustrated that for a second time Odom was attempting to complete a direct hire which was completely inconsistent with my direction and established policy for the division.

> In only an abundance of caution, on the chance that Crane was uniquely qualified, as well as out of respect to Odom and Zicarelli, I further sought advice from Birmingham Division Assistant Special

---

[10]  In his sworn statement Maley referred to "a division-wide 'issue list'" he created upon beginning work in the Birmingham division in July 2009 which "consist[ed] of about 140 issues requiring remedies." (Doc. 69-1 at 101). "Issue 76" was entitled "The posting of support jobs does not appear to be transparent." (Doc. 69-1 at 103).

> Agent in Charge (ASAC) Charles Regan, who had previously directly supervised Crane. Regan described Crane as a poor and underperforming employee and very highly recommended that Crane not be hired for the position. Regan did not mention to me anything regarding Crane's national origin, or anything relative to Crane having any involvement, at anytime [sic], in EEO protected activities.

(Doc. 69-1 at 107-108).

Maley states that he "also sought the advice of Supervisory Intelligence Analyst (SIA) Stephen Robert Forsyth, who directly worked for Crane on the Field Intelligence Group." (Doc. 69-1 at 107). According to Maley, Forsyth "described Crane in a manner similar to ASAC Regan and did not recommend Crane for the position." (Doc. 69-1 at 107). Maley states that he does not recall Forsyth mentioning anything to him about Crane's national origin, or any of Crane's EEO activities. (Doc. 69-1 at 107).

Maley noted that, when he learned from either Regan or Forsyth (he could not remember which), that Odom and Crane were friends, "that exacerbated the situation," "because the direct hiring of Crane would be perceived by division personnel as possibly underhanded or nefarious." (Doc. 69-1 at 107). Maley states that, based on all of the information he received, he directed Odom and Zicarelli to post the position both internally and externally. (Doc. 69-1 at 108). He states that his motivation in doing so was "to have a fair and open posting to allow internal

17

candidates to have an opportunity to compete for the job in complete transparency."

(Doc. 69-1 at 108).[11]

### 5. *Regan's Version*

In Regan's sworn statement, he states that when Maley spoke to him he recalls

that he told Maley that he "viewed Crane as lazy, that he had a history of being late

for work, and that he was a disruptive influence within the office." (Doc. 69-1 at 3).

He also states that he told Maley that "it was a good day when [Crane] resigned from

the FBI." (Doc. 69-1 at 3). He also recalls mentioning to Maley that Odom and

Crane were personal friends. (Doc. 69-1 at 3). He states that he did not mention to

Maley "anything regarding Crane's national origin, or anything relative to Crane

having any involvement, at anytime, in EEO protected activities." (Doc. 69-1 at 3).

### 6. *Forsyth's Version*

Forsyth states in his sworn statement that he "was not contacted, and did not

---

[11] The plaintiff proffers the following facts:

27.     With no independent knowledge about the Plaintiff, Maley relied on
Regan's false information about Tracy Crane. Signed Sworn Statement of Patrick
Maley at 8 - 9 (Exhibit "I").

28.     Based on Regan's adverse comments, the FBI did not direct hire Crane,
but instead conducted a competition for the position. Deposition of Raymond
Zicarelli (Exhibit "H") at 75.

(Doc. 69 at 10). The citations given by the plaintiff do not support the conclusory and vague
statement that Maley "relied on Regan's false information about Tracy Crane," or that the
decision to post the position was based on "Regan's adverse comments."

speak, with . . .  Maley, concerning the potential direct hiring, or hiring of Crane."
(Doc. 69-1 at 131).  He does not recall ever having any discussion with Maley
regarding Crane.  (Doc. 69-1 at 131).  Forsyth states that Maley did not ask him if he
"would recommend or not recommend Crane to fill the Paralegal Specialist position."
(Doc. 69-1 at 131).

   E.   **The Position Is Filled**

On or about July 13, 2010, the Birmingham Office advertised the Paralegal
Specialist/Asset Forfeiture Investigator position both externally and internally.  After
posting for the Paralegal Specialist position, the FBI only considered internal
candidates (current FBI employees) for the position.

Although there is some discussion in the evidence of an entity called the
"career board," the parties have presented no evidence or argument regarding which
person or what entity was the "decisionmaker" in this case.  However, it is undisputed
that an FBI employee, Dan Russell, a Caucasian male FBI motor pool mechanic, was
selected (by someone or something) for the position.  There is evidence that Russell
was the No. 2 candidate overall, and No. 3 on Zicarelli's list of candidates.  (Doc. 69-
1 at 69(90)).  Zicarelli could not recall what discussions he had with the career board
about who was most qualified for the position.  (Doc. 69-1 at 58(46)).  Russell had
been unsuccessfully considered before for the same position on at least 3 different

occasions.

On November 17, 2010, Crane asked the Administrative Officer ("AO") of the Birmingham Office what progress was being made to solve the funding problem. The AO informed Crane that the Birmingham Office had filled the position through a competitive hiring process on or about the prior August of 2010 . This was the first time that Crane knew about the FBI's use of the posting process instead of the "direct hire" process to fill the job.

Crane had served on the Career Board, or selection panel, on one or more of those occasions, and Crane was familiar with the mechanic's qualifications. In his affidavit, Crane notes:

> (1) [Crane] possessed a Master's Degree, while [the mechanic] only had a Bachelor's Degree; (2) [Crane] had successfully served as the Paralegal Specialist/Asset Forfeiture Investigator before, while the motor pool mechanic had never held a similar position; (3) the FBI hired the mechanic at a GS-7 pay grade the previous August, which was a reduction from his WG-10 motor pool position, while [Crane] had already held the same Paralegal Specialist/Asset Forfeiture Investigator position at a higher pay grade; (4) [Crane] had successfully served as the GS-14 Commander of a FIG, where [he] supervised Special Agents, other investigators, and other technical personnel, while the motor pool mechanic had never served in such a supervisory capacity of investigators[.]

(Doc. 69-1 at 26).

**F.    <u>Other Facts</u>**

Regan knew the plaintiff was Native American.

Zicarelli confirmed in his deposition that was "aware that the FBI places an emphasis on Native American hiring." (Doc. 69-1 at 66(79)). Zicarelli also agreed that "to the best of our ability," it is "the duty of every FBI employee to make sure that FBI policies, procedures, directives, and guidelines are followed." (Doc. 69-1 at 68(88)). Zicarelli retired on or about September 1, 2010.

In his affidavit, the plaintiff states that when he first met Regan, Regan made derogatory comments about Native Americans. (Doc. 69-1 at 23). The plaintiff states that, at their first meeting, Regan stated, "I don't want any Wounded Knee sympathizers in my command." (Doc. 69-1 at 23). At some later point, the plaintiff states that Regan referred to a former co-worker, Jane Turner, and complained that she was never in the FBI's Minneapolis Office because she was "always out in Indian land"–using the phrase "in Indian land" as an expression of disdain. (Doc. 69-1 at 23). The plaintiff states that during a later "career counseling" session between Regan and Crane, Regan referred to Native Americans as "lazy," "disgusting," "drunk," "people who beat their wives," and "people who committed incest." (Doc. 69-1 at 23). At this session, Regan discouraged Tracy Crane from using the "Indian card" during Crane's career with the FBI. (Doc. 69-1 at 23).

Odom stated in his affidavit that, "[i]n previous conversations prior to . . .

Crane's retirement in 2008," Regan "and others" told him "that . . . Crane was doing an excellent job. . . . Regan and others told [Odom] that Crane did an excellent job until his retirement in 2008."  (Doc. 74 at 34, ¶2).

The plaintiff never applied for the Paralegal Specialist position. The plaintiff never submitted a resume or application in response to the Paralegal Specialist position posting.  The plaintiff was never formally offered the position and never received anything in writing offering him the Paralegal Specialist position in 2011.

### G.   The Charge of Discrimination/Investigation

Plaintiff first contacted the FBI's EEO office on December 27, 2010, and filed a charge of discrimination ("COD") or about February 7, 2011.  (Doc. 20-1 at 1-2). The COD indicates that the "[m]ost [r]ecent [a]lleged [d]iscrimination [t]ook [p]lace" on January 24, 2011. (Doc. 20-1 at 1).  In the COD, the plaintiff only checked the boxes for National Origin (Native American) and Reprisal discrimination. (Doc. 20-1 at 1). Plaintiff did not check the box to indicate a claim for Sex, Age, Religion, or any other type of discrimination.  (Doc. 20-1 at 1).

In response to the COD's Question No. 7 asking how he was discriminated against, the plaintiff attached a single-spaced document to explain his claim of discrimination.  (Doc. 20-1 at 4-6).  In his EEO complaint, in answer to the question asking how he was discriminated against, the plaintiff attached a two page, single

spaced document which discussed the factual allegations contained herein, including Zicarelli's attempts to recruit the plaintiff as a direct hire, Zicarelli's alleged statement about the "budget issue" preventing Crane from being directly hired right away, the posting of the position, and the subsequent filling of the position with someone outside of his protected class. (Doc. 20-1 at 4-6). By letter dated April 12, 2011, the defendant notified the plaintiff that it had accepted for investigation:

> Whether [the plaintiff] was discriminated against based on national origin (Native American) and reprisal for alleged prior EEO activity when a decision was made to fill the position of Paralegal Specialist, Birmingham Division, internally instead of hiring him as a direct hire.

(Doc. 12-2 at 1). On April 12, 2011, the plaintiff was notified, in writing, that only the above-referenced issue was accepted for investigation.  (Doc. 12-2 at 1-2). The plaintiff was also notified that if he believed "the bases or allegation described in [his] EEO complaint has not been properly identified," he could appeal this in writing, "within 15 calendar days after [his] receipt of this letter."  (Doc. 12-2 at 2).

## III.   ANALYSIS

### A.   <u>Age Discrimination (Count Eight)</u>

The Amended Complaint alleges that the defendant discriminated against the plaintiff on account of his age in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* ("ADEA") (Count Eight).  (Doc. 16 at 21-22).

23

However, in his brief in opposition to the defendant's motion for summary judgment,

the plaintiff states that he "is not pursuing an Age Discrimination Claim." (Doc. 74

at 16). In light of this representation, the court determines that the age discrimination

claim is abandoned. Summary judgment will be granted as to Count Eight.

### B.    **"Racially Disparate Impact [Discrimination]" (Count Two)**

#### 1.    *The Plaintiff Failed to Exhaust His Administrative Remedies Regarding This Claim*[12]

The law is clear that

> [b]efore an aggrieved employee may seek relief through the filing of a
> civil action in federal court . . . he or she must first seek relief in the
> agency that has allegedly engaged in discrimination. *Brown v. GSA,* 425
> U.S. at 832, 96 S.Ct. at 1967–68. This requirement is not a technicality;
> "[r]ather, it is part and parcel of the congressional design to vest in the
> federal agencies and officials engaged in hiring and promoting
> personnel 'primary responsibility' for maintaining nondiscrimination in
> employment." *Kizas v. Webster*, 707 F.2d 524, 544 (D.C.Cir.1983).

*Grier v. Sec'y of Army*, 799 F.2d 721, 724 (11th Cir. 1986); *see also, Tillery v. U.S.*

*Dep't of Homeland Sec.*, 402 F. App'x 421, 425 (11th Cir. 2010) (*citing Crawford v.*

*Babbitt*, 186 F.3d 1322, 1326 (11th Cir.1999)) (prior to filing a Title VII action, a

federal employee must timely exhaust his administrative remedies). In order to

---

[12] This argument was raised by the defendant in his response to the plaintiff's motion for summary judgment. (Doc. 75-1 at 32-35). The plaintiff failed to respond to this argument in his reply brief. (Doc. 78). It is also not addressed in either of the plaintiff's briefs in support of his own motion for summary judgment. (Docs. 69, 74).

exhaust his administrative remedies, the plaintiff must first "seek relief in the agency

that has allegedly discriminated against him." *Brown v. Gen. Servs. Admin.*, 425 U.S.

820, 832, 96 S. Ct. 1961, 1967, 48 L. Ed. 2d 402 (1976).  The Eleventh Circuit has

noted that

> the purpose of exhaustion is to permit the department the first
> opportunity to investigate the alleged discriminatory or retaliatory
> practices, and a plaintiff's judicial complaint is thereby limited by the
> scope of the investigation that can reasonably be expected to grow out
> of the administrative charge of discrimination or retaliation. *See*
> *Gregory v. Georgia Dep't of Human Res.,* 355 F.3d 1277, 1279–80 (11th
> Cir.2004). The proper inquiry is, therefore,  whether the plaintiff's
> judicial complaint was like or related to, or grew out of, the
> administrative allegations. *See id.* at 1280. *id.* at 1279–80 (quotation
> omitted).

*Basel v. Sec'y of Def.*, 507 F. App'x 873, 875 76 (11th Cir. 2013)

In this case, although the plaintiff initially sought relief from the Department

of Justice by filing a charge of discrimination on or about February 7, 2011, the

charge did not allege disparate impact discrimination and did not discuss the

plaintiff's current allegations that "[t]he FBI is woefully deficient in the hiring of

Native Americans." (Doc. 69 at 5 (proffered fact 5)).  Those allegations are not "like

or related to" the administrative complaint's allegations, nor could they be expected

to "grow out of" them.  For this reason, the disparate impact claims must be

dismissed.

### 2. *The Disparate Impact Claim Also Fails on Its Merits*

#### a. The Plaintiff Fails to Establish a Prima Facie Case of Disparate Impact Discrimination

In *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263 (11th Cir. 2000), the

Eleventh Circuit explained:

> "[D]isparate impact theory prohibits *neutral* employment practices which, while non-discriminatory on their face, visit an adverse, disproportionate impact on a statutorily-protected group. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971) (explaining that Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation"); *see also In re Employment,* 198 F.3d at 1311; *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1117 (11th Cir.1993). The doctrine seeks the removal of employment obstacles, not required by business necessity, which create " 'built-in headwinds' " and freeze out protected groups from job opportunities and advancement. *Griffin v. Carlin,* 755 F.2d 1516, 1524 (11th Cir.1985) (quoting *Griggs*, 401 U.S. at 431–32, 91 S.Ct. 849). As the district court correctly identified, "[t]he premise of disparate impact theory is that some employment practices, adopted without a deliberately discriminatory motive, may be the functional equivalent of intentional discrimination." *Joe's Stone Crab,* 969 F.Supp. at 735. In essence, disparate impact theory is a doctrinal surrogate for eliminating unprovable acts of intentional discrimination hidden innocuously behind facially-neutral policies or practices.
>
> The disparate impact framework under Title VII by now is well-settled. "Since *Griggs*, Congress has codified the appropriate burdens of proof in a disparate impact case in 42 U.S.C. § 2000e–2(k) (1994), and a settled jurisprudence has arisen to implement the methodology." *In re Employment,* 198 F.3d at 1311. . . . <u>[A] plaintiff in a [disparate impact case] must establish three elements: *first,* that there is a significant statistical disparity between the proportion of [the protected class] in the available labor pool and the proportion of</u>

26

[persons in the protected class] hired; *second,* that there is a specific, facially-neutral, employment practice which is the alleged cause of the disparity; and *finally,* and most critically in this case, that a causal nexus exists between the specific employment practice identified and the statistical disparity shown. . . . *See generally MacPherson v. University of Montevallo,* 922 F.2d 766, 771 (11th Cir.1991) (citing *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 655–56, 109 S.Ct. 2115, 2124, 104 L.Ed.2d 733 (1989); *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 994–95, 108 S.Ct. 2777, 2789, 101 L.Ed.2d 827 (1988)).

According to Title VII, "[i]n the first stage of a disparate impact case, the 'complaining party [must] demonstrate [ ] that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin.' " *In re Employment,* 198 F.3d at 1311 (quoting 42 U.S.C. § 2000e–2(k)(1)(A)(I)). "To 'demonstrate' means to 'meet[ ] the burdens of production and persuasion.' " *Id.* (quoting 42 U.S.C. § 2000e(m) (1994)). "In other words, in order to surmount the first hurdle in a disparate impact race discrimination case, the plaintiff must make out a prima facie case 'that [a] facially neutral employment practice ha[s] a significantly discriminatory impact.' " *Id.* (quoting *Connecticut v. Teal*, 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982)). As the Supreme Court explained in *Watson,* "the plaintiff must offer statistical evidence of a kind and degree sufficient to show that *the practice in question* has *caused* the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Watson,* 487 U.S. at 994, 108 S.Ct. 2777 (emphasis added); *see also Edwards v. Wallace Community College,* 49 F.3d 1517, 1520 (11th Cir.1995) (observing that "[a] plaintiff must identify a specific employment practice that leads to the disparate impact"); *MacPherson,* 922 F.2d at 771(noting that " 'a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack' ") (internal citation omitted).

Once each of these three elements are shown, a plaintiff has established a prima facie case of disparate impact discrimination. See *Fitzpatrick,* 2 F.3d at 1117; *MacPherson,* 922 F.2d at 771. The burden

> of production then shifts to the defendant to establish that the challenged
> employment practice serves a legitimate, non-discriminatory business
> objective. *See Fitzpatrick,* 2 F.3d at 1117. However, even if the
> defendant satisfies this burden, a plaintiff may still prevail by proving
> that an alternative, non-discriminatory practice would have served the
> defendant's stated objective equally as well. *See id.* at 1118.

*E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1274-75 (11th Cir. 2000)

(emphasis by underlining added); *see also, Turner v. City of Auburn*, 361 F. App'x

62, 65 (11th Cir. 2010) ("To establish a prima facie case of disparate impact

discrimination, a plaintiff must show (1) a significant statistical disparity among

members of different racial groups; (2) a specific facially-neutral employment policy

or practice; and (3) a causal nexus between that specific policy or practice and the

statistical disparity."); *Johnson v. Bd. of Trustees of Univ. of Ala.*, 191 F. App'x 838,

843 (11th Cir. 2006) (discussing the burden shifting framework of disparate impact

cases).[13]

---

[13]  The plaintiff sets out the incorrect elements for a prima facie case.  The plaintiff
paraphrases the following quote from *Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008):

> To make out a prima facie case of racial discrimination a plaintiff must show (1)
> she belongs to a protected class; (2) she was qualified to do the job; (3) she was
> subjected to adverse employment action; and (4) her employer treated similarly
> situated employees outside her class more favorably.

*Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).  He then states, without citation to
authority, that "[t]he . . . elements hold true for both individual and disparate impact cases."
(Doc. 69 at 17; doc. 74 at 17).  *Crawford* is a disparate <u>treatment</u> case.  The elements cited apply
<u>only</u> to those cases.  Confusingly, in one of his briefs, the defendant also cites the *Crawford*
statement of the prima facie case.  (Doc. 71 at 15).  However, in another brief, he cites the <u>correct</u>
elements.   (Doc. 75-1 at 35).  The use of the incorrect legal framework by <u>both</u> parties has

In the instant case, the plaintiff argues only that "Native Americans only account for .40% of the Special Agents (i.e., 55 Special Agents out of 13,766 total agents) and only 0.51% of the Profession Staff Employees (i.e., 111 Professional Staff Employees out of 21,863 total professional staff employees)." (Doc. 69 at 17; doc. 74 at 17-18). However, the singular fact that a small number of Native Americans are employed at the FBI is not, alone, evidence of a significant statistical disparity between the proportion of Native Americans in the available labor pool and the proportion of Native Americans hired. Further, the plaintiff fails to even allege a specific facially-neutral employment policy or practice and a causal nexus between that specific policy or practice and the statistical disparity.[14] "[A] plaintiff must do more than simply identify a workforce imbalance to establish a prima facie disparate impact case; it must causally connect a facially-neutral employment practice to the identified disparity." *Joe's Stone Crab, Inc.*, 220 F.3d at 1276. The plaintiff's disparate impact claims fail.

---

contributed to the court's difficulty in resolving these motions.

[14] Even the Amended Complaint merely states only generally that the "[d]efendant's hiring policies and practices have a disparate impact on Native-American salaried applicants," and "[d]efendant ineffectively recruits, hires, or retains Native Americans . . . [t]he FBI has less than 1% of Native Americans on its employment roles. [sic]" (Doc. 16 at 19). Although the plaintiff does discuss at the length the aforementioned diversity program put in place by the FBI (*see* doc. 69 at 18-19, 20; doc. 74 at 18-19, 21), that is not a facially neutral policy or practice which would result in fewer Native Americans being hired. Indeed, the plaintiff argues the contrary–that it is non-neutral and should result in more Native Americans being hired.

> **b.      The Plaintiff's "Other" Arguments in Support of His Disparate Treatment Claim Are Without Merit**

The plaintiff's discussion of Regan's alleged comments regarding Native Americans, his alleged opinions regarding that group of individuals, and his statements regarding the plaintiff's work history (doc. 69 at 19-20, 22-23; doc. 74 at 20, 22-23), are irrelevant in a disparate impact scenario, which does not focus on intent.[15]   Similarly, whether or not "the boss" was kept "in the dark," about the plaintiff's status as a Native American (doc. 69 at 21, 22; doc 74 at 21, 22)  is irrelevant to this discussion.  The key is whether the plaintiff identified a <u>neutral</u> policy or practice which kept him from being hired.  He did not.

Summary judgment is appropriate in favor of the defendant on Count Two.

> **C.      "National Origin Discrimination" – The Disparate Treatment Claim (Count One)**

> **1.      *The Exact Nature of the Plaintiff's Claim***

The court has found this claim especially difficult to resolve because the

---

[15]   The plaintiff's citation to *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 1094, 67 L. Ed. 2d 207 (1981) in the midst of his disparate <u>impact</u> argument underscores his misunderstanding.  (Doc. 69 at 20; doc. 74 at 20).  The citation he gives references the "disparate <u>treatment</u>" analysis.  Similarly, as noted previously, the plaintiff's discussion of the disparate treatment prima facie elements from *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (*see* doc. 69 at 20-21; doc. 74 at 20-21) is misplaced.

plaintiff constantly presents a moving target as the basis for this claim.[16] Sometimes he argues that his claim is based on the failure to directly hire him.  *See, e.g.* doc. 69 at 25; doc. 74 at 25 ("The decision not to 'direct hire' the [p]laintiff was based solely on the poisonous discussion with Regan."); doc. 78 at 3 ("The [d]efendant must provide 'significant probative evidence demonstrating the existence of a triable issue of fact' on the issue of whether there was an effort to direct hire [the plaintiff].") (emphasis in original). Elsewhere the plaintiff's arguments center on the posting of the position, and the failure to inform the plaintiff that it had been posted.  *See e.g.*, doc. 69 at 27 and doc. 74 at 27 ("After the decision not to 'direct hire' Crane, the FBI advertized the job.  No one, including Maley, advised Crane that the job was going to be advertized for applicants through the competitive process."); doc. 78 at 6 ("Maley changed the course of the hiring process from direct hiring of Crane to advertized hiring only after talking to Regan."). The Amended Complaint alleges something altogether different, more generally stating that "[t]he [d]efendant violated Title VII when SAC Maley hired a less qualified non minority over [p]laintiff." (Doc. 16 at 18).

     In his EEO complaint, in answer to the question asking how he was

---

[16]  While the parties have not raised this issue, the court finds that any discussion of the merits of this claim cannot begin until its exact nature is determined.

discriminated against, the plaintiff attached a two page, single spaced document which discussed the factual allegations contained herein, including Zicarelli's attempts to recruit the plaintiff as a direct hire, Zicarelli's alleged statement about the "budget issue" preventing Crane from being directly hired right away, the posting of the position and subsequent filing of the position with someone outside of his protected class. (Doc. 20-1 at 4-6). By letter dated April 12, 2011, the defendant notified the plaintiff that it had accepted for investigation:

> Whether [the plaintiff] was discriminated against based on national origin (Native American) and reprisal for alleged prior EEO activity when a decision was made to fill the position of Paralegal Specialist, Birmingham Division, internally instead of hiring him as a direct hire.

(Doc. 12-2 at 1).[17]

As has been noted:

> In this circuit, a plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary

---

[17]  Whether the claim in Count One is administratively barred was not raised by the parties.  The court is not required to reach this issue *sua sponte*.  *See, Harris v. Bd. of Trustees Univ. of Alabama*, 846 F. Supp. 2d 1223, 1236 (N.D. Ala. 2012) (Hopkins, J.) (*citing Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S. Ct. 1127, 71 L. Ed. 2d 234 (1982) ("Though required, exhaustion of administrative remedies is not a 'jurisdictional requirement' such that it would divest the court of subject-matter jurisdiction.").  Regardless, the court finds that the allegations in the judicial complaint are like, related to, and/or could be expected to grow out of the administrative complaint.  *See, Basel v. Sec'y of Def.*, 507 F. App'x 873, 877 (11th Cir. 2013) (*citing Gregory v. Georgia Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004)) ("[The] judicial complaint [is] limited by the scope of the investigation that could reasonably be expected to grow from the [administrative] complaint.").

> judgment. *Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1315
> (11th Cir.2004) (per curiam). Fed.R.Civ.P. 15(a)." *Hurlbert v. St.*
> *Mary's Health Care Sys., Inc.,* 439 F.3d 1286, 1297 (11th Cir.2006).
> And it goes without saying that the court is barred from amending a
> plaintiff's claim. One reason for barring such amendment is that in *sua*
> *sponte* amending a plaintiff's claim on summary judgment, the court may
> create the impression that it has become the plaintiff's advocate—or his
> worst enemy—depending on what the court does with the claim after
> amending it.

*Miccosukee Tribe of Indians of Florida v. United States*, 716 F.3d 535, 559 (11th Cir.

2013). Considering the EEO complaint, the totality of the factual allegations in the

judicial complaint, and the broad wording of Count One, the court determines that the

plaintiff has not alleged new claims in his briefs from those alleged in his Amended

Complaint. Instead, the court determines that there is only one claim of disparate

treatment national original discrimination–that the defendant hired a non-Native

American for the position over the plaintiff. The events surrounding the "direct hire,"

the posting of the position, the failure to inform the plaintiff that the position was

posted, and all other factual allegations, merely support this one claim.

### 2. *The McDonnell Douglas Framework*

Title VII provides:

> [i]t shall be an unlawful employment practice for an employer . . . to fail
> or refuse to hire or to discharge any individual, or otherwise to
> discriminate against any individual with respect to his compensation,
> terms, conditions, or privileges of employment, because of such
> individual's race, color, religion, sex, or national origin.

42 U.S.C.A. § 2000e-2(a)(1).  "In evaluating disparate treatment claims supported by

circumstantial evidence, we use the framework established by the Supreme Court in

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668

(1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101

S.Ct. 1089, 67 L.Ed.2d 207 (1981)."  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079,

1087 (11th Cir. 2004).  Under that framework,

> [t]he Title VII plaintiff bears "the ultimate burden of proving discriminatory treatment by a preponderance of the evidence." *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081 (11th Cir.1990). Thus, under the first part of *McDonnell Douglas,* the plaintiff must establish by a preponderance of the evidence a prima facie case of discrimination. If she does, the burden of production shifts to the employer, which requires the employer to introduce evidence of "some legitimate, nondiscriminatory reason" for its employment decision. *McDonnell Douglas,* 411 U.S. at 802. If the employer satisfies its burden, "the presumption raised by the prima facie case is rebutted." *Collado v. United Parcel Serv. Co.,* 419 F.3d 1143, 1151 (11th Cir.2005) (internal quotation marks omitted). Because the burden of persuasion remains with the employee, she must then show that the seemingly legitimate reason the employer gave was pretextual—i.e., the "proffered reason was not the true reason for the employment decision." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 508, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (internal quotation marks omitted); *see also Collado,* 419 F.3d at 1150 (noting that once the employer satisfies its burden "the presumption of discrimination that arose when the plaintiff made [her] prima facie showing 'drops from the case,' and 'the case is placed back into the traditional framework—in other words, the plaintiff still bears the burden of proving, more probably than not, that the employer took an adverse employment action against [her] on the basis of a protected personal characteristic' " (internal citations omitted)).

*Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1202 (11th Cir. 2013).

> **3.     *Neither Party Is Entitled to Summary Judgment on Whether the Plaintiff Has Satisfied His Prima Facie Case Because Each Has Argued the Wrong Elements***

Similar to the arguments regarding disparate <u>impact</u>, both motions for summary judgment begin the disparate <u>treatment</u> argument by incorrectly articulating the required elements of a prima facie case.

The defendant argues: "In a prima facie case of discrimination for an alleged non-selection case, a plaintiff meets his prima facie burden of proof by establishing that (1) he is a member of a protected class; (2) he was qualified for the position; (3) he was subjected to an adverse employment action; and (4) he was treated less favorably than a similarly situated person outside his protected class." (Doc. 71 at 16). The plaintiff's motion sets out, for the most part, the exact same elements. (Doc. 69 at 17). While these are the <u>standard</u> elements for a disparate treatment case, *see E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000), the Eleventh Circuit has noted that "[t]he methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree <u>upon the employment situation</u>." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004) (emphasis added) (*citing Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181,

1185 (11th Cir.1984)); *see also, McDonnell Douglas Corp.*, 411 U.S. at 806, n. 13 ("The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations.").

The <u>correct</u> articulation of the elements in a <u>failure to hire national origin discrimination</u> case is:   "(1) that [the plaintiff] is a member of a protected class, (2) that [he] applied and was qualified for the job, (3) that despite [his] qualifications, []he was rejected, and (4) that the position remained open or was filled by a person outside the protected class."  *Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs*, 47 F.3d 1068, 1073 (11th Cir. 1995) (failure to hire national origin discrimination); *see also, Patterson v. McLean Credit Union*, 491 U.S. 164, 186-87, 109 S. Ct. 2363, 2378, 105 L. Ed. 2d 132 (U.S. 1989)("[plaintiff must] prove by a preponderance of the evidence that she applied for and was qualified for an available position, that she was rejected, and that after she was rejected respondent either continued to seek applicants for the position, or, as is alleged here, filled the position with a  white employee"); *McDonnell Douglas Corp.*, 411 U.S. at 802 ("[plaintiff must prove] (I) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the

36

employer continued to seek applicants from persons of complainant's qualifications"); *Lane v. Broward Cnty., Florida*, 411 F. App'x 272, 273 (11th Cir. 2011) (same); *Childress v. Caterpillar Logistics Servs., Inc.*, 369 F. App'x 95, 96 (11th Cir. 2010) (same but stating the fourth element as "the defendant filled the position with a person outside the protected class").

The fact that the parties <u>both</u> argued the wrong set of elements for the plaintiff's prima facie case means that summary judgment on that issue is inappropriate for <u>either</u> side.  The Eleventh Circuit has admonished that "'[s]ummary judgment is such a lethal weapon, depriving a litigant of a trial on the issue, caution must be used to ensure only those cases devoid of any need for factual determinations are disposed of by summary judgment.'" *Chapman v. AI Transp.*, 229 F.3d 1012, 1069 (11th Cir. 2000) (*quoting Tippens v. Celotex Corp.*, 805 F.2d 949, 952–53 (11th Cir.1986)).  Further, it is "[t]he party moving for summary judgment [who] 'bears the initial responsibility of informing the district court of the basis for its motion.'" *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1314-15 (11th Cir. 2011) (*quoting  Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)).  The court cannot see how either movant satisfied its burden when both fail to set out, or argue, the proper elements of the plaintiff's prima facie case.

Nor does the court feel that it can properly grant summary judgment *sua sponte* on this issue.  The Eleventh Circuit has previous stated that a party against whom summary judgment is granted, even if done *sua sponte*, must have been given "adequate notice that they must present all of their evidence."  *Imaging Bus. Machines, LLC. v. BancTec, Inc.*, 459 F.3d 1186, 1191 (11th Cir. 2006).  Here, neither side can be said to have adequate notice that they must present all their evidence on elements not even raised by the other side.[18]

### 4.    *The State of the Evidence Suggests that Summary Judgment is Inappropriate on this Issue*

In addition to the above reasons for not granting summary judgment the state of the evidence suggests multiple genuine issues of material fact that preclude summary judgment.  A reasonable jury could conclude that Zicarelli "offered" and the plaintiff "accepted" the position at issue, which was ultimately taken away from the plaintiff, posted, and given to a person outside the plaintiff's protected class.  The plaintiff was certainly qualified for the position, as he had held it before.  This alone seems to satisfy the elements of the plaintiff's prima facie case.

Albeit in reference to the wrong elements, the defendant argues that Zicarelli

---

[18]   The defendant could argue that its motion amounts to a general attack that the plaintiff's prima facie case is in some (unstated) way insufficient.  This argument would also fail as  "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

had no authority to offer the plaintiff the position.  Indeed, Zicarelli states that he was never "involved in any direct hire in the FBI," and was not "involved in any direct hiring policy or procedures."   (Doc. 69-1 at 79(132)). Zicarelli confirmed in his deposition that "as the former CDC . . . it was not [his] job to perform any of the HR duties." (Doc. 69-1 at 79(131-132)).  However, Maley confirmed in his affidavit that Zicarelli and Odom had "recruited" the plaintiff, "were attempting a direct hire," and, by the time Maley found out about it, "the direct hiring process was well underway." (Doc. 69-1 at 106).  Based on this evidence, a reasonable jury could conclude that Zicarelli had the authority to and did directly hire the plaintiff.[19]

The defendant, again focusing on the wrong elements, argues that the plaintiff did not suffer "an adverse employment action."  (Doc. 71 at 16-19; doc. 75-1 at 28). He writes:

> Plaintiff did not suffer any real harm because he was only informed of a potential job vacancy opportunity that he did not even apply for when it was posted on a public website.
>
> The fact that Plaintiff was told about an upcoming vacancy and then failing to apply for the position [sic] does not qualify as an adverse employment action under Title VII discrimination . . .

(Doc. 71 at 18) (emphasis added).  He also writes:

---

[19]  Regardless of Zicarelli's authority, which only pertains to the direct hire issue, ultimately the plaintiff was not offered the position, or even considered for it, by the person or entity that hired Russell.

> Plaintiff did not suffer an adverse employment action because <u>he never applied for the position.</u> There is absolutely no evidence that Plaintiff was ever formally offered the position as a direct hire, especially since CDC Zicarelli also called other potential candidates about the very same position. Plaintiff never received any paperwork, an offer of salary, or a conditional offer from the FBI's BFO or Headquarters. Instead, he received a call from CDC Zicarelli who never directly hired an employee during the course of his FBI career and did not have authority to offer Plaintiff a direct hire position.

(Doc. 75-1 at 28) (emphasis added).   Even if the court construes this misplaced argument as attacking the (correct) prima facie element, which requires the plaintiff to have applied for the position, the argument still fails.[20]  The Eleventh Circuit has stated that

> a plaintiff makes out a prima facie case—that is, he creates a presumption of discrimination and forces the employer to articulate legitimate reasons for his rejection—as long as he establishes that the company <u>had some reason or duty to consider him for the post. The employer cannot avoid a Title VII violation by showing that it incorrectly assumed that the plaintiff was uninterested in the job. When the plaintiff had no notice of or opportunity to apply for the job, such a reason for rejection is "legally insufficient and illegitimate".</u>

*Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1133 34 (11th Cir. 1984) (emphasis added); *see also, Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1276 (11th Cir. 2002) ("Under *Carmichael,* an employee may be excused from the application requirement of a prima facie case 'as long as he establishes that the

---

[20]  As noted above, the element requires a showing that the plaintiff applied and was qualified for the job.

company had some reason or duty to consider him for the post.'"). In the instant case, the evidence, when cast in the light most favorable to the plaintiff, establishes that Zicarelli was attempting to directly hire the plaintiff for the position, the plaintiff accepted the position, and then Zicarelli told the plaintiff that "funding problems," would cause a delay and that the hire would take place after the start of the new fiscal year. Of course, in reality, Maley, once he found out what was happening, ordered that the position be posted, and it was, on June 13, 2010.

Regardless of whether Zicarelli had authority to hire the plaintiff, a jury could determine that the reason the plaintiff never applied for the job was because he did not know that he needed to. Indeed, casting the evidence in the light most favorable to the plaintiff, Zicarelli led the plaintiff to believe that the job was already his. Further, Maley admits that he knew about the attempts to directly hire the plaintiff when he ordered that the job be posted. Despite Maley's knowledge of the interaction between the plaintiff and Zicarelli, no one informed the plaintiff that the job would be posted and that the plaintiff needed to apply.[21] Under these circumstances, the defendant not only should have advised the plaintiff that the position was posted, it had a "reason" and a "duty" to consider him for the position. *See*, *Walker*, 286 F.3d

---

[21] Further, since the plaintiff was retired, it cannot be said that he should have been aware of the posting in the office.

at 1276. Under these circumstances, the plaintiff's "failure to apply" is excused.

Of course, as noted, the above cited evidence is cast in the light most favorable to the plaintiff. There remains a genuine issue of material fact as to what occurred in the conversations between Zicarelli and the plaintiff and Zicarelli and Mrs. Crane. Other evidence referenced above is also disputed. Accordingly, summary judgment also is not appropriate for the plaintiff on this claim.

### D. __Retaliation__

The defendant alleges that the plaintiff cannot establish a prima facie case of retaliation.

#### 1. *The Nature of the Plaintiff's Claims*

The plaintiff's initial and reply briefs in support of his motion for summary judgment do not discuss retaliation. The plaintiff's entire argument on this issue can be found in his response to the defendant's motion, where he writes only:

> After the [p]laintiff's retirement and sometime in late 2009 or early 2010, [p]laintiff Tracy Crane submitted a statement in support of . . . Odom's EEO complaint against the FBI. . . . The submission of a statement related to an EEO complaint is a protected activity.
>
> Prior to Crane's submission of the statement supporting Odom's EEO complaint, there were no job performance criticisms of Crane by management. . . . Odom reported that the attitude about Crane by management changed after Crane submitted this statement. . . . Only a few short weeks later, senior management declined to direct hire Crane even though the direct hiring process was "well underway." The

conclusion is that Crane's participation in a protected activity further poisoned management's attitude against him and contributed to the discriminatory employment decision.

(Doc. 74 at 31-32).   This argument is vague, but seems to suggest that "the discriminatory employment decision" at issue is only the failure to <u>directly</u> hire the plaintiff.  However, none of the retaliation counts assert <u>that</u> claim.[22]  The closest is

---

[22]  As noted above, the plaintiff alleges retaliation in four confusing counts.  The complaint states:

> 127. The Defendant violated the anti-retaliation provision of Title VII by the comments of . . . SAC Maley's SSS dated 6/22/2011, Maley says one of the reasons for Plaintiff's denial of employment was due in part to Issue #46 of the Birmingham Issue List.

> 128. Maley's denial of Plaintiff's employment was due to the Plaintiff being involved in the EEO process (issue #46) and his friendship with Odom.

(Doc. 16 at 20 (quoting Count Four))

> 130. The Defendant violated the anti-retaliation provision of Title VII by SAC Maley's SSS dated 6/22/2011, Maley stated "a direct hire would have violated my commitment to the Birmingham division employees to create a transparency and trusting workplace and violate established division policy, and would have created a real or perceived perception that Odom was hiring a 'friend' in a noncompetitive, 'under the table' manner."

> 131. Maley hired the spouse of a Special Agent as a direct hire SST. Maley has encouraged all employees to recruit and obtain resumes from "friends and family." Maley's denial of Plaintiff's employment is inconsistent with his actions.

(Doc. 16 at 20 (quoting Count Five).

> 133. The Defendant violated the anti-retaliation provision of Title VII when he failed to exercise reasonable care to prevent and promptly correct wrongful conduct within the Birmingham Division, despite being repeatedly made aware of retaliatory actions and violations directly related to and connected with Title VII activity, which resulted in Plaintiff's harm and the harm of others known and

Count Four, which alleges that "Maley's denial of [p]laintiff's employment was due to the [p]laintiff being involved in the EEO process (issue #46) and his friendship with Odom."  (Doc. 16 at 20).

Still, in light of the court's analysis determining that the plaintiff's direct hire discrimination allegations are merely part of his larger failure to hire discrimination allegations, the court reaches the same conclusion here regarding the plaintiff's retaliation claims, and holds that the plaintiff's argument is in support of Count Four. However, the court will deem <u>all</u> other bases for the plaintiff's retaliation counts to be abandoned, and will grant summary judgment to the defendant on Counts Five, Six, and Seven.  *See,  Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

---

unknown.

(Doc. 16 at 21 (quoting Count Six)).

135. The Defendant violated the anti-retaliation provision of Title VII when he improperly counseled the Plaintiff and conducted a biased investigation.

(Doc. 16 at 21 (quoting Count Seven)). Each quoted portion cited above constitutes the entirety of the count except for the following language which appears at the beginning of each count: "Plaintiff re-alleges and incorporates by reference the above paragraphs with the same force and affect as if fully set forth herein, and further states as follows[.]"

## 2.   *Analysis*

The Eleventh Circuit has noted that

> Title VII also prohibits retaliation against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [thereunder]." 42 U.S.C. § 2000e–3(a).  Title VII requires the plaintiff to show that: (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *Pennington v. City of Huntsville,* 261 F.3d 1262, 1266 (11th Cir.2001).

*Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).   The *Crawford* case

continues:

> In the past this circuit's standard for both discrimination and retaliation claims has required an employee to establish an "ultimate employment decision" or make some other showing of substantiality in the employment context in order to establish an adverse employment action. *See Stavropoulos v. Firestone,* 361 F.3d 610, 616–17 (11th Cir.2004); *Gupta v. Florida Board of Regents,* 212 F.3d 571, 587 (11th Cir.2000); *Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232, 1239 (11th Cir.2001). We defined ultimate employment decisions as those "such as termination, failure to hire, or demotion." *Stavropoulos,* 361 F.3d at 617. And we required that conduct falling short of an ultimate employment decision must, in some substantial way, "alter[ ] the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect [ ] his or her status as an employee." *Gupta,* 212 F.3d at 587 (quotation and citation omitted). More particularly, when defining the level of substantiality required for a Title VII discrimination claim, we required an employee to demonstrate she suffered "a *serious and material* change in the terms, conditions, or privileges of employment" to show an adverse

45

employment action. *Davis,* 245 F.3d at 1239 (emphasis added).

*Crawford*, 529 F.3d at 970.

The defendant moves for summary judgment on the retaliation claims, arguing that the plaintiff cannot establish a prima facie case of discrimination because: 1) the plaintiff did not engage in prior protected activity; and 2) the plaintiff suffered no adverse employment action.  (Doc. 71 at 16-21).[23]  There is evidence that the plaintiff participated in the EEO investigation of Odom's claim by filing an affidavit in support of Odom.  That is clearly protected activity.  Further, the failure to hire the plaintiff is an adverse employment action.  *See,* 42 U.S.C.A. § 2000e-3(a) (prohibiting discrimination against an applicant for employment "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.").  Summary judgment is not appropriate for the defendant on the issue of whether the plaintiff has established a prima facie case of retaliation.[24]

---

[23]  The defendant's only argument on this issue is found in its brief in support of his motion for summary judgment.  (Doc. 71).  There is no discussion of retaliation in the defendant's response to the plaintiff's motion for summary judgment (doc. 75-1), or the defendant's reply (doc. 77) to the plaintiff's response to the defendant's motion for summary judgment.

[24]  The plaintiff has not moved for summary judgment on this issue, but, even if he had, there remain genuine issues of material fact as to the plaintiff's prima facie case.  The court here makes no judgment as to any other aspect of the plaintiff's prima facie case of retaliation.

46

E.     **Pretext**

Assuming that the plaintiff "has established a prima facie case of discrimination, the burden shifts to the employer to produce 'legitimate, nondiscriminatory reasons for the challenged employment action.'" *Conner v. Lafarge N. Am., Inc.*, 343 F. App'x 537, 541 (11th Cir. 2009) (*quoting Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)). Similarly,

> [a]s with claims of substantive discrimination, Title VII retaliation claims require that "[o]nce the plaintiff establishes [a] prima facie case, the employer must proffer a legitimate, non-discriminatory reason for the adverse employment action."

*Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008). Assuming the defendant has proffered a legitimate non-discriminatory reason, "[i]n order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." *Chapman v. AI Transp.*, 229 F.3d 1012, 1037 (11th Cir. 2000). The Eleventh Circuit has noted that

> an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman,* 229 F.3d at 1030. If the employer proffers more than one legitimate, non-discriminatory reason, the plaintiff must rebut *each* of the reasons to survive a motion for summary judgment. *Id.* at 1037. A legitimate nondiscriminatory reason proffered by the employer is not a "pretext for discrimination unless it is shown *both* that the reason was false *and* that discrimination was the real reason." *St. Mary's Honor*

*Center v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993) (citation omitted).

*Garcia v. DS Waters of Am., Inc.*, 372 F. App'x 925, 927 (11th Cir. 2010).

Summary judgment is not appropriate for the defendant[25] on the issue of pretext because, instead of focusing on the ultimate issue of whether the plaintiff was discriminated against when he was not hired, the defendant's reasons focus exclusively on the "direct hire" allegations.  He argues:

1) the plaintiff was "simply" told that the position would be posted.  (Doc. 71 at 22; 75-1 at 31-32; 77 at 8);

2) Zicarelli called others (not just the plaintiff) about the position and the plaintiff was never formally notified that he had the position through the direct hire process (Doc. 71 at 22);

3) Zicarelli did not have authority to directly hire for the position (Doc. 75-1 at 31);

4) Maley did not think directly hiring someone for a position was appropriate and thought the best course of action for the FBI, to include employee morale, was to allow others, including FBI employees, to compete for positions within the BFO (Doc. 75-1 at 31; 77 at 9);

---

[25] The plaintiff has not moved for summary judgment on this issue.

5) SAC Maley did not know Plaintiff or that Plaintiff was a Native American (Doc. 75-1 at 31); and

5) Regan's comments did not affect Maley's because he did not want anyone to be directly hired for the position (Doc. 75-1 at 32).

The defendant does not give any reasons why Crane was not: 1) told about the position's being posted; 2) considered for the position after it was posted; or 3) ultimately hired when someone outside of his protected class was.[26] Accordingly, the defendant has failed to carry its burden and summary judgment is not appropriate.[27]

---

[26] The defendant might be arguing that it did not consider the plaintiff because he never applied for the position after he was told that it would be posted. While that argument appears elsewhere in the defendant's submissions, it is not listed as one of his legitimate non-discriminatory reasons and, again, the court is under no obligation to formulate arguments for the defendant. Further, it would be unfair to assume such an argument when it was not presented to the plaintiff, and therefore the plaintiff had no opportunity to rebut it.

[27] The court notes that there is significant evidence from which a jury could determine that the reasons that were proffered were not the reasons the plaintiff was not hired. For example, while the defendant argues that the plaintiff was told that the position "would be" posted, Zicarelli stated that he never called Crane back to tell him that the position had been posted. (Doc. 69-1 at 69(89)). Crane stated that Zicarelli told him that he had the job, and that he only learned later, after the position had been filled, that the job had been posted. Further, as shown in earlier sections of this opinion, a reasonable jury could conclude that Zicarelli had at least some authority to directly hire the plaintiff and actually did so. Finally, the defendant argues that Regan's comments had no affect on Maley, and that Maley did not directly hire the plaintiff because he was against direct hires in general. Certainly there is evidence that direct hires were not Maley's preferred method, but Maley also stated that, "[i]n only an abundance of caution, on the chance that Crane was uniquely qualified, as well as out of respect to Odom and Zicarelli, I further sought advice from . . . Regan, who had previously directly supervised Crane." (Doc. 69-1 at 107). A reasonable jury could determine that Crane might (or might not) have been directly hired, but that, in this instance, Regan's bad recommendation, not Maley's general policy, made sure that would not happen. There is also at least some evidence that at one point Maley might have hired Crane, but for the comments by Regan, who had a history of negative

## IV.   CONCLUSION

Based on the foregoing, the plaintiff's motion for summary judgment is **DENIED.**  The defendant's motion for summary judgment is **GRANTED** as to Counts  Two, Three, Five, Six, Seven, and Eight.  Those Counts are **DISMISSED with prejudice**.  The defendant's motion is **DENIED** in all other respects.

**DONE** and **ORDERED** this 11th day of December, 2014.

_____
**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

comments regarding Native Americans.  Regardless, the court need not reach these issues, as it finds the defendant has not carried its burden.

50